# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 9, 2005 Session

## STATE OF TENNESSEE v. DAVID IVY

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 01-12388      Joseph B. Dailey, Judge**

---

**No. W2003-00786-SC-DDT-DD - Filed February 28, 2006**

---

The defendant, David Ivy, was convicted of premeditated first degree murder and was sentenced to death. In imposing a death sentence, the jury found that two aggravating circumstances, i.e., the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person and the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another, had been established beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(i)(2) and (6) (Supp. 1999). In addition, the jury determined that the evidence of aggravating circumstances outweighed the evidence of mitigating circumstances beyond a reasonable doubt. Id. at (c). The Court of Criminal Appeals affirmed the convictions and the death sentence.

After the appeal was docketed in this Court, we entered an order identifying eight issues for oral argument.[1] Having reviewed the record and applicable authority, we now hold that: 1) the evidence was sufficient to support the first degree murder conviction; 2) the trial court did not err in impaneling an anonymous jury; 3) the trial court properly ruled that the victim's statements were admissible under the "forfeiture by wrongdoing" hearsay exception; 4) the evidence supported the jury's findings that the two aggravating circumstances were proven beyond a reasonable doubt; 5) the trial court erred during the sentencing phase in instructing the jury that two of the five prior felony convictions relied on by the prosecution involved violence to a person, but the error was harmless beyond a reasonable doubt; 6) the trial court erred in allowing the prosecution to introduce the defendant's prior indictment for first degree murder in the sentencing phase of the trial where the defendant had been convicted of second degree murder, but the error did not affect the outcome; 7) the trial court erred in ruling that defense counsel could not argue residual doubt as a mitigating circumstance during the sentencing phase, but the error did not affect the outcome; and 8) the evidence of aggravating circumstances outweighed the evidence of mitigating circumstances beyond a reasonable doubt, and the death sentence was not arbitrary or disproportionate. We also agree with

---

[1]"Prior to the setting of oral argument, the Court shall review the record and briefs and consider all issues assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2

the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix. Thus, the Court of Criminal Appeals' judgment is affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

E. RILEY ANDERSON, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER and CORNELIA A. CLARK, JJ., joined. ADOLPHO A. BIRCH, JR., J., filed a separate concurring and dissenting opinion.

Robert Wilson Jones, Public Defender; Tony N. Brayton, Assistant Public Defender; and Garland Ergüden, Assistant Public Defender, Memphis, Tennessee, for the Appellant, David Ivy.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General; Amy Weirich, Assistant District Attorney General; and Gerald Harris, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On June 8, 2001, the victim, LaKisha Thomas ("Thomas"), was shot to death while sitting in her car in the parking lot of an apartment complex in Memphis, Tennessee. On June 27, 2001, Thomas's estranged boyfriend, David Ivy ("Ivy"), was arrested for premeditated first degree murder. After a jury trial, Ivy was convicted of premeditated first degree murder and was sentenced to death. The evidence presented during the guilt and penalty proceedings is summarized below.

**Guilt Phase**

In June of 2000, the defendant, David Ivy, was released from prison and placed on parole. Thereafter, he began dating the victim, LaKisha Thomas.

The relationship was marked by Ivy's violence against Thomas. For example, Jackie Bland ("Bland"), the victim's cousin, testified that she once saw Ivy pull Thomas's hair and that on another occasion, Thomas told her that Ivy had kicked in her door and broken her furniture. Deborah Kelley ("Kelley"), another cousin, testified that she also saw Ivy grab Thomas by her hair; when Kelley intervened, Ivy said, "I told you about playing with me, bitch." Andrea Hunt ("Hunt") testified that Thomas told her that Ivy "had her on 23 and 1," because he would only allow her to leave her apartment one hour per day.

In May of 2001, Officer Alvin Clark of the Memphis Police Department responded to a call at Thomas's apartment on Millbranch Road. Thomas told Officer Clark that Ivy had forced his way into her apartment and threatened to kill her. Thomas said that Ivy had been threatening to harm her

because she wanted to end the relationship. Officer Clark testified that Thomas was "very shaken up and afraid."

Similarly, on the morning of June 6, 2001, Officer Steve Cummings responded to a call at Jackie Bland's apartment, where he found a bleeding and bruised Thomas. Thomas told Officer Cummings that her "ex-boyfriend," Ivy, had attacked her at a nearby convenience store and had struck her in the head "with a black Uzi type pistol." Thomas told Officer Cummings that Ivy, who was also known as "Day Day," told her "he wasn't going back to jail" and "he would . . . kill her." Officer Cummings testified that Thomas had a two-inch laceration on her head, bruising on her chest, and a black eye on the right side of her face.

Deborah Kelley and Jackie Bland also saw the victim after she was attacked on June 6, 2001. According to Kelley, she arrived at Bland's apartment and found that Thomas was bleeding and bruised. Bland said, "Look what [Ivy] did . . . ." Kelley testified that Thomas told her she had been attacked by Ivy and that Ivy wanted to kill her. Bland called the police. After Officer Cummings responded to the call, Kelley and Bland drove Thomas to the Criminal Justice Center to swear out a warrant against Ivy. While en route, they saw Ivy following them in his car. Kelley pulled over and called police, but Ivy was gone when the police arrived. The women then continued to the Criminal Justice Center where Thomas swore out a warrant for aggravated assault against Ivy.[2]

After leaving the Criminal Justice Center, Thomas, Kelley, and Bland drove to a liquor store. Ivy, who again had been following them, appeared in the parking lot and approached the car. According to Bland, Ivy told Thomas, "Bitch, if you put the police in my business, I'm going to kill you." Similarly, when Kelley returned to the car from the liquor store, Thomas told her that Ivy threatened to kill her "if she put the police in his business."

Ivy's conduct in the liquor store parking lot was captured by a surveillance camera and was witnessed by two employees. One employee, Terrance Hibler, heard Ivy tell Thomas that "it wasn't over" and that "[h]e was going to get her." According to Hibler, Thomas, who was "shaking real bad," said, "I know he's going to kill me." Similarly, another employee, Frank Sullivan, noticed that Thomas was "shaking" and "bruised pretty badly." He too heard Thomas say that Ivy was going to kill her. The police were called; when they arrived at the liquor store, Thomas was taken to the Criminal Justice Center, where she obtained an ex parte order of protection against Ivy.[3]

Two days later, on the morning of June 8, 2001, Thomas and Hunt were outside Bland's apartment complex in Thomas's car. According to Hunt, Ivy ran up to the car while wearing a black cap and a towel over part of his face. Ivy pulled the towel from his face and said, "Oh, bitch, you want me dead, huh?" He shot Thomas five times and fled. Bland, who was outside her apartment,

---

[2] Officer Cummings testified that a warrant charging the defendant with aggravated assault was issued the next day.

[3] Although a hearing was scheduled for June 21, 2001, attempts to serve the defendant with the notice of the ex parte order on June 15, June 19, and June 20 were unsuccessful.

likewise saw someone wearing a black hat, sunglasses, and a towel over his mouth run up to the car and "open fire." Although the shooter's face was partly covered with a towel, Bland said that he resembled Ivy. Similarly, Deborah Kelley, who was inside Bland's apartment, heard a gunshot followed by screaming. According to Kelley, Bland said, "Call the police. Day Day shot [the victim]." Kelley then heard the noise of tires in the parking lot.

Gregory Kelley, the brother of Deborah Kelley and Jackie Bland, was working as a maintenance supervisor at the apartment complex when he heard gunshots and screaming. He ran to a green car and saw that Thomas had been shot. He pulled Thomas from the car and applied pressure on her wounds while shouting for someone to call 911. He then saw a "white car speed up out of the apartments" that resembled Ivy's car.

Officer Alvin Clark arrived at the scene and saw a white car speeding from the apartment complex. He found that the victim had no pulse. Spent shell casings, bullet fragments, and live rounds were found at the scene.

Dr. O. C. Smith, the medical examiner for Shelby County, Tennessee, conducted an autopsy on the victim. The victim had five gunshot wounds that entered the right side of her body from a distance of no more than two feet away. Although Dr. Smith could not determine the sequence of the gunshots, he concluded that two of the gunshots struck the victim's heart and that the gunshots affected all of the victim's major organs except her spleen. Dr. Smith concluded that the multiple gunshots caused the victim's death and that the two gunshots to the victim's heart would have "ended her life the quickest."

Ivy was arrested on June 27, 2001, and he was incarcerated in the Shelby County Jail pending trial. He escaped from jail in May of 2002. Two months later, Ivy was captured in San Diego, California, after diving through a window and fleeing from police officers for several blocks.

After the prosecution rested its case in chief, Vickie Crawford testified on the defendant's behalf. She stated that she had lived with Ivy and that Ivy was the father of her daughter. She learned that Ivy was dating Thomas in October of 2000, but she had heard of no problems in their relationship.

The jury convicted Ivy of premeditated first degree murder. The trial then moved into the sentencing phase to determine the punishment.

**Sentencing Phase**

The prosecution presented the testimony of the victim's sister, Elaine Thomas. Ms. Thomas testified that the victim was survived by four children under the age of ten. The children were separated from each other after the victim was murdered and their school work suffered. According to Ms. Thomas, the victim had been the "backbone" of the family, and her death affected the entire family.

The prosecution also presented evidence of Ivy's indictments and convictions for five prior felony offenses. In 1993, Ivy was indicted for premeditated first degree murder and felony murder, and he pleaded guilty to second degree murder. Ivy was also indicted for especially aggravated robbery and three counts of aggravated assault, and he pled guilty to these offenses as well.

In mitigation, Ruby Ivy, the defendant's oldest sister, testified that her brother was born in 1972 and was one of nine children. Ms. Ivy testified that she had been responsible for raising her brother because their mother had health problems. She stated that Ivy was "a good guy" who could "get along with anybody." She said that Ivy loved children and was a talented singer. She acknowledged that she knew about her brother's prior convictions. She asked the jury not to sentence her brother to death.

Vickie Crawford testified that she, Ivy, and the victim had been friends. She said that she maintained contact with Ivy even when Ivy was imprisoned for second degree murder. She intended to continue her relationship with Ivy since he was her daughter's father. She asked the jury to spare Ivy so that their daughter would get to know him.

Other witnesses testified in mitigation. William Fletcher, a former neighbor of the Ivy family, stated that Ivy was a "pretty nice kid" who always treated him with respect. Gladys Hobson, another former neighbor, testified that decisions of "life and death" should not be made by man. Similarly, Kim Mackey, an acquaintance of the victim and David Ivy, testified that "life and death are [not] in our hands."

After deliberating, the jury imposed a death sentence. The jury found that the two aggravating circumstances relied on by the prosecution, i.e., the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person and the murder was committed for avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another, had been proven beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(i)(2) and (6). The jury also found that the two aggravating circumstances outweighed the evidence of mitigating circumstances beyond a reasonable doubt. Id. at (c).

On appeal, the Court of Criminal Appeals affirmed the defendant's convictions and death sentence. The defendant's appeal was then automatically docketed in this Court.

# ANALYSIS

## Guilt Phase Issues

### *Sufficiency of Evidence*

Ivy argues that the evidence does not support the first degree murder conviction because there was insufficient evidence of his identity as the perpetrator. The State maintains that the evidence was sufficient to support the conviction.

When evaluating the sufficiency of the evidence, we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We are required to afford the prosecution the strongest legitimate view of the evidence in the record, as well as all reasonable and legitimate inferences which may be drawn therefrom. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of the witnesses, the weight to be given the evidence, and the factual issues are resolved by the trier of fact. Id.; see also State v. Cole, 155 S.W.3d 885, 897 (Tenn. 2005); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).

The offense of first degree murder includes a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1998). A premeditated act is "an act done after the exercise of reflection and judgment" and means that "the intent to kill must have been formed prior to the act itself." Id. at (d). An intentional act refers to "the nature of the conduct or to a result of the conduct when it is [a] person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (1997).

We agree with the Court of Criminal Appeals' conclusion that the evidence was sufficient to support the first degree murder conviction. The evidence showed that Ivy had been physically and mentally abusive to Thomas throughout their relationship. When Thomas tried to end the relationship, Ivy's violence against her escalated. On June 6, 2001, Ivy beat Thomas with a pistol, followed her as she drove to and from the Criminal Justice Center in Memphis, confronted her in the parking lot of a liquor store, and threatened to kill her. His actions were filmed by a surveillance camera and his numerous threats were heard by several witnesses. Two days later, on June 8, 2001, Ivy shot Thomas five times from close range as she sat helpless in her car. A passenger in the car, Andrea Hunt, knew Ivy and identified him as the shooter. Another witness, Jackie Bland, who also knew Ivy, stated that Ivy resembled the shooter. Several witnesses saw a white car resembling Ivy's speeding from the scene.

Ivy nonetheless argues that the evidence was insufficient because the testimony of Andrea Hunt conflicted with that of Jackie Bland; in particular, Ivy asserts that the witnesses disagreed as to whether the perpetrator had been wearing sunglasses. The jury's role, however, is to weigh the credibility of the witnesses and to resolve any factual conflicts in the evidence. Our sole task is to review the legal sufficiency of the evidence. Having done so under the standards of review

explained above, we have concluded that the evidence was sufficient to support the conviction for first degree murder.

*Anonymous Jury*

Ivy next contends that the trial court violated his right to a fair and public trial by an impartial jury by impaneling an anonymous jury. Ivy argues that the trial court had no authority for using an anonymous jury and that the procedure was tantamount to telling the jury that he was guilty of the charged offense. See U.S. Const. amend. V, VI, and XIV; Tenn. Const. art. I, § 6. The State maintains that the trial court did not err in impaneling an anonymous jury.

We begin our review of this issue by closely examining the record. Prior to trial, the prosecution requested that the trial court impanel an anonymous jury. The prosecution asserted that a witness had been shot at (and her baby injured) following Ivy's preliminary hearing and that a relative of Ivy's had been charged in that incident. The prosecution also asserted that Ivy was a danger to jurors because he had previously escaped from custody.

In granting the prosecution's request to impanel an anonymous jury, the trial court weighed "the risk of prejudice to the defendant" against "the [jury's] heightened level of concern and fear . . . for their safety or the safety of their families." The trial court emphasized the following:

> First and foremost the alleged motive for this murder to have occurred . . . and that is to keep the victim of this murder from testifying against this defendant and thereby send him back to prison. And then the alleged act by the relative of this defendant. . . . That resulted in an indictment that's now pending in this division of court that is an act that was allegedly perpetrated against a witness in this case.

The trial court concluded that "to place [jurors] in danger or their families in danger or potentially place them in danger would simply not be very responsible on the part of the system." The Court of Criminal Appeals affirmed the ruling.

Whether an anonymous jury may be impaneled in a criminal case is an issue of first impression for this Court. As we begin our review, we find little assistance in Tennessee statutes and procedural rules. For instance, Tennessee Code Annotated section 40-18-104 (2003) states only that "[t]he names of the jurors are written on separate scrolls, and placed in a box or other receptacle, and drawn out by . . . the judge, or some person agreed upon by the district attorney general and the defendant." Similarly, Rule 24(g) of the Tennessee Rules of Criminal Procedure provides that "[u]pon request the parties shall be furnished with a list of members of the jury panel, containing the following information with respect to each: name, address, occupation, name of spouse, occupation of spouse." We can find no statute or rule, however, that either permits or proscribes the use of an anonymous jury.

In turning to other jurisdictions for guidance, it appears that nearly every court that has addressed the issue has recognized that anonymous juries may be impaneled in an appropriate case without violating a defendant's constitutional rights under the United States Constitution.[4] See United States v. Talley, 164 F.3d 989, 1001 (6th Cir. 1999); United States v. Edmond, 52 F.3d 1080, 1090 (D.C. Cir. 1995); United States v. Ross, 33 F.3d 1507, 1519 (11th Cir. 1994); United States v. Crockett, 979 F.2d 1204, 1215 (7th Cir. 1992); United States v. Scarfo, 850 F.2d 1015, 1021 (3d Cir. 1988); United States v. Barnes, 604 F.2d 121, 140 (2d Cir. 1979); see also State v. Samonte, 928 P.2d 1, 12-17 (Haw. 1996); People v. Williams, 616 N.W.2d 710, 712-14 (Mich. Ct. App. 2000); State v. Bowles, 530 N.W.2d 521, 529-31 (Minn. 1995); State v. Tucker, 657 N.W.2d 374, 379-82 (Wis. 2003).

These courts have recognized that impaneling an anonymous jury implicates a number of competing interests. The Second Circuit has said, for instance, that the decision to impanel an anonymous jury requires a court to "balance the defendant's interest in conducting meaningful voir dire and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict." United States v. Amuso, 21 F.3d 1251, 1264 (2d Cir. 1994); see also Talley, 164 F.3d at 1001; Edmond, 52 F.3d at 1093; Samonte, 928 P.2d at 13.

In achieving this balance, many courts have adopted a two-prong framework for determining when an anonymous jury is appropriate. The first prong is whether there is a strong reason to believe that the jury needs protection. See Talley, 164 F.3d at 1001; United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991). A trial court may consider a defendant's alleged participation in organized crime, a defendant's alleged participation in a group with the capacity to threaten jurors, a defendant's past efforts to interfere with the judicial process, the defendant's possible punishment if convicted, and the pervasiveness of trial publicity that may reveal the jurors' names and expose them to public scrutiny. See Edmond, 52 F.3d at 1091; Ross, 33 F.3d at 1520. The second prong of the framework is whether reasonable precautions will minimize prejudice to the defendant and ensure that fundamental rights are protected. Talley, 164 F.3d at 1001. Such precautions may include enhanced voir dire, instructions to the jury as to neutral reasons for their anonymity, and instructions to the jury on the presumption of innocence. See Edmond, 52 F.3d at 1093 (jury was instructed that anonymity was routine); Talley, 164 F.3d at 1002 (jury was instructed that anonymity was due to media interest); Crockett, 979 F.2d at 1216 (jury was instructed on the presumption of innocence).

Based on these principles and the overwhelming weight of authority, we believe that anonymous juries may be impaneled under Tennessee law. As discussed earlier, no provision

---

[4] Indeed, several states have authorized anonymous juries or have adopted procedures for the routine use of anonymous juries through legislation. See, e.g., Del. Code Ann. § 4513(a) (1994).

forbids the use of anonymous juries in Tennessee. Moreover, affording the trial court this discretion is consistent with the broad discretion afforded trial courts in matters concerning jury selection. Finally, given the responsibilities and burdens placed upon jurors in our judicial system, we agree that adopting the two-prong framework used in other jurisdictions allows the trial court to preserve the safety and sanctity of the jury as required in appropriate cases while at the same time preserving the individual rights of the accused.

In applying the first prong to this case, we conclude that the trial court did not abuse its discretion in finding that there were strong reasons to protect the jury. The trial court found that an apparent motive in committing the charged offense included Ivy's desire to prevent the victim from going to police. Although the trial court also found that a relative of Ivy's had been indicted for shooting at a witness in this case, we give this finding relatively little weight since there was no evidence in the record in this regard. We do note, however, that Ivy had escaped on at least one occasion while in custody for this offense. Moreover, courts have held that the defendant need not have a past history of jury tampering and that a history of violence and attempting to obstruct justice may support a determination that impaneling an anonymous jury is appropriate. See Edmond, 52 F.3d at 247; United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); Crockett, 979 F.2d at 1216; Paccione, 949 F.2d at 1993; Scarfo, 850 F.2d at 1017. In short, the evidence supports the trial court's finding.

In applying the second prong to this case, we note that the trial court did not give a specific instruction to the jury on the issue of its anonymity. Although this may be a preferred practice, we do not believe the absence of an instruction is controlling. Indeed, one may argue that a specific instruction as to anonymity simply calls the jury's attention to what it may have believed to be the accepted procedure. In any event, the record reveals that the trial court conducted a lengthy voir dire and allowed both parties to question the prospective jurors extensively. Moreover, the trial court instructed the jury that Ivy was presumed innocent, that the prosecution had the burden of establishing guilt beyond a reasonable doubt, and that the indictment was not evidence. Since the jury is presumed to follow jury instructions absent evidence to the contrary, we conclude that these instructions protected against the possibility of prejudice. See Edmond, 52 F.3d at 248; Crockett, 979 F.2d at 1216; United States v. Vario, 943 F.2d 236, 241 (2d Cir. 1991); Samonte, 928 P.2d at 11.

Accordingly, we hold that Ivy is not entitled to relief based on the trial court's decision to impanel an anonymous jury.

*Admission of Victim's Statements*

Ivy next argues that the trial court committed reversible error in admitting statements made by Thomas under Rule 804(b)(6) of the Tennessee Rules of Evidence. He argues that Rule

804(b)(6), which allows the admission of "[a] statement offered against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness," does not apply where the declarant is the victim of the offense being tried. Ivy also argues that the admission of Thomas's statements violated his right of confrontation under the United States and Tennessee Constitutions.

The State argues that the trial court properly ruled that Thomas's statements were admissible pursuant to Rule 804(b)(6). The State maintains that the rule does not require the declarant to be an actual witness and that the defendant's intent need not have been *solely* to prevent the declarant from testifying. The State further argues that the Court of Criminal Appeals erred in finding that the admission of the statements was error, albeit harmless, because the appellate court substituted its findings for the factual findings made by the trial court.

We begin our review by examining the record to place the numerous issues and sub-issues into context. Prior to trial, Ivy filed a motion asking the trial court to rule on the admissibility of hearsay statements Thomas made to police and other witnesses. The prosecution argued that Thomas's statements were admissible under Rule 804(b)(6) of the Tennessee Rules of Evidence because Ivy's wrongdoing resulted in Thomas's unavailability to testify as a witness against him. In particular, the prosecution reasoned that Ivy killed the victim to prevent her from testifying against him in a trial for the aggravated assault on June 6, 2001, or in a hearing to revoke his parole based on the aggravated assault.

After a hearing, the trial court ruled that the following statements would be admitted: 1) Thomas's statement that Ivy had pulled her hair; 2) Thomas's statements about Ivy's violent acts when he moved out of her apartment; 3) Thomas's statements about the aggravated assault that occurred on June 6, 2001; and 4) Thomas's statements in the parking lot of the liquor store. The trial court found that the statements were relevant "to show the motive of the killing and to . . . paint an accurate picture of the hostility that might have existed in this relationship by the defendant toward the victim and what his intent would have been during the course of the relationship." In finding that Thomas's statements were admissible under Rule 804(b)(6), the trial court reasoned:

> I think that the hearsay exception that was cited is also applicable.
> . . . Following the State's theory, [Ivy] wasn't taking these actions to
> prevent her from being a witness in this murder case obviously. It
> would have been to prevent her from being a witness at the parole
> violation hearing and/or aggravated assault trial that might have come
> about. . . . *But . . . if it were appropriate to apply this hearsay
> exception to those instances, then the greater harm would be to kill
> her and have this murder case resulting. So it would not be logical*

*to say that it would apply to the lesser but not the greater. So it would apply also.*

(Emphasis added).

On appeal, the Court of Criminal Appeals concluded that the trial court erred in admitting the statements under Rule 804(b)(6). The appellate court found that a preponderance of the evidence did not establish that Ivy acted with the intent to procure Thomas's absence as a witness. The court, however, held that the error was harmless because of the admissibility of some of Thomas's statements under another hearsay exception, excited utterances, and the overall strength of the evidence against Ivy.

As noted above, Rule 804(b)(6), which is often called the "waiver by misconduct" or "forfeiture by misconduct" rule, allows the admission of "[a] statement offered against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness." Since this Court has never addressed or applied Rule 804(b)(6), and since the rule itself contains no express parameters or limitations, we turn to other jurisdictions for guidance.

In addressing rules nearly identical to Rule 804(b)(6) of the Tennessee Rules of Evidence, federal courts have universally held that witnesses' statements are admissible "where the defendant has wrongfully procured the witnesses' silence through threats, actual violence or murder." United States v. Dhinsa, 243 F.3d 635, 651 (2d Cir. 2001); see United States v. Garcia-Meza, 403 F.3d 364, 370 (6th Cir. 2005); United States v. Cherry, 217 F.3d 811, 814 (10th Cir. 2000); United States v. Emery, 186 F.3d 921, 926 (8th Cir. 1999); United States v. White, 116 F.3d 903, 911 (D.C. Cir. 1997); United States v. Houlihan, 92 F.3d 1271, 1279 (1st Cir. 1996). As one court has explained:

> It is hard to imagine a form of misconduct more extreme than the murder of a potential witness. Simple equity supports a forfeiture principle, as does [] common sense. . . . The defendant who has removed an adverse witness is in a weak position to complain about losing the chance to cross examine him. *And where a defendant has silenced a witness through the use of threats, violence or murder, admission of the victim's prior statements at least partially offsets the perpetrator's rewards for his misconduct.*

White, 116 F.3d at 911 (emphasis added).

In emphasizing that defendants may not benefit from their own wrongdoings in causing the unavailability of a witness, a majority of courts have agreed on the following principles. First, Rule 804(b)(6) does not limit a declarant's statements to *past* events or *prior* offenses the declarant would

-11-

have testified about. Dhinsa, 243 F.3d at 652. Indeed, the plain language of Rule 804(b)(6) "refers to the intent of a party to procure the unavailability of the *witness*, and does not . . . limit the subject matter of the witness testimony . . . ." Dhinsa, 243 F.3d at 652. As the Eighth Circuit said in Emery:

> [The defendant] contends that these principles should apply only in a trial on the underlying crimes about which he feared [the victim] would testify, not in a trial for murdering her. We believe that both the plain meaning of Fed. R. Evid. 804(b)(6) and the manifest object of the principles just outlined mandate a different result. The rule contains no limitation on the subject matter of the statements that it exempts from the prohibition on hearsay evidence.

Emery, 186 F.3d at 926.

Second, Rule 804(b)(6) is not limited to those cases in which a formal charge or judicial proceeding was pending against a defendant when the declarant's statements were made, nor cases in which a defendant's *sole* intent or motivation was to procure the declarant's absence. See Dhinsa, 243 F.3d at 653-54. Instead, the purpose of Rule 804(b)(6) dictates that it applies where the defendant "was motivated in part by a desire to silence the witness." Houlihan, 92 F.3d at 1279; see also Garcia-Meza, 403 F.3d at 370.

We conclude that these principles are consistent with the purpose and the plain language of Rule 804(b)(6) of the Tennessee Rules of Evidence. To ensure that the rule is properly applied, however, we further adopt the requirement that the trial court conduct a hearing outside the presence of the jury to determine whether a declarant's statements are admissible. Dhinsa, 243 F.3d at 653-54. In such a hearing, in order for the statements to be admissible, the trial court must find that a preponderance of the evidence establishes 1) that the defendant was involved in or responsible for procuring the unavailability of the declarant; and 2) that a defendant's actions were intended, at least in part, to procure the absence of the declarant.

Applying these principles to this case, we hold that the trial court correctly determined that Thomas's statements were admissible under Rule 804(b)(6) of the Tennessee Rules of Evidence. The preponderance of the evidence supported the trial court's finding that Ivy killed Thomas to prevent her from contacting police about his aggravated assault on June 6, 2001. Ivy followed Thomas as she drove to and from the Criminal Justice Center in Memphis, Tennessee, to swear out a warrant against him that was never served. He killed her only two days later. Given these facts, we disagree with the Court of Criminals Appeals' view that Rule 804(b)(6) required that Ivy had to know about the issuance of an arrest warrant for the aggravated assault; moreover, there was no requirement that Ivy's *sole* intention had to be preventing Thomas from testifying against him in a proceeding based on the aggravated assault.

Contrary to Ivy's argument, the trial court's application of Rule 804(b)(6) did not violate his constitutional right to confrontation under the United States or Tennessee Constitutions. In Crawford v. Washington, 541 U.S. 36, 68 (2004), the United States Supreme Court held that a declarant's statements that are testimonial in nature are not admissible under the Confrontation Clause unless 1) the declarant is unavailable and 2) the defendant had a prior opportunity to cross-examine the declarant. The Court emphasized, however, the rule of forfeiture by wrongdoing "extinguishes confrontation claims on essentially equitable grounds." Id. at 62. Given that Rule 804(b)(6) of the Tennessee Rules of Evidence is identical in language and purpose to the federal rule, we see no reason to reach a different result under the confrontation clause of the Tennessee Constitution.

## Sentencing Phase Issues

*Sufficiency of Aggravating Circumstances*

Ivy argues that the evidence was insufficient to support the two aggravating circumstances applied by the jury in imposing the death penalty. The State maintains that the evidence was sufficient.

Our analysis requires that we view the evidence in a light most favorable to the State and determine whether a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. State v. Reid, 164 S.W.3d. 286, 314 (Tenn. 2005). We will address the two aggravating circumstances applied in this case in turn. Tenn. Code Ann. §§ 39-13-204(i)(2) and (6) (Supp. 1999); see also Tenn. Code Ann. § 39-13-206(c)(1)(B) (Supp. 1999) (requiring review of aggravating circumstances found by the jury).

First we consider the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2), which states: "The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person[.]" The plain language requires the prosecution to prove that the defendant had (1) a prior conviction, (2) for a felony offense, (3) whose statutory elements involved the use of violence to a person. Reid, 164 S.W.3d at 314-15; State v. Davis, 141 S.W.3d 600, 618-19 (Tenn. 2004).

In this case, the prosecution established this aggravating circumstance by relying on Ivy's prior convictions for second degree murder, especially aggravated robbery, and aggravated assault. The trial court correctly found that second degree murder and especially aggravated robbery were felonies whose statutory elements involved the use of violence to a person. Indeed, second degree murder requires a knowing killing of another, Tenn. Code Ann. § 39-13-210 (Supp. 1990), and especially aggravated robbery requires a robbery accomplished with a deadly weapon where the victim suffered serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (1989). In addition, the trial

court determined that Ivy's three prior convictions for aggravated assault involved the use of violence to a person.  Tenn. Code Ann. § 39-13-102(a) (Supp. 1993); see State v. Sims, 45 S.W.3d 1, 10-12 (Tenn. 2001) (where the statutory elements reveal that a prior offense may be committed with or without violence to a person, the trial court must determine if the offense involved violence to a person).

We conclude that the evidence introduced before the jury was sufficient to support the jury's application of this aggravating circumstance beyond a reasonable doubt.[5]

We next consider Tennessee Code Annotated section 39-13-204(i)(6), which applies where a "murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another."  Section 204(i)(6) focuses on a defendant's motives in committing a murder and is not limited to the killings of eyewitnesses or those witnesses who know or can identify the defendant.  See Reid,164 S.W.3d at 315; Terry v. State, 46 S.W.3d 147, 162 (Tenn. 2001).  Indeed, the defendant's desire to avoid arrest or prosecution need not be the sole motive for killing the victim and instead may be just one of the purposes motivating the defendant to kill.  Reid, 164 S.W.3d at 315; see also Davis, 141 S.W.3d at 618-19.

Here, the evidence showed that Ivy was on parole when he attacked Thomas near a convenience store on June 6, 2001.  He later followed Thomas as she drove to the Criminal Justice Center to swear out a warrant, and he threatened to kill her if she "got the police in his business."  Only two days later, Ivy shot Thomas five times at close range.  In sum, the evidence was sufficient to support the jury's determination that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution beyond a reasonable doubt.[6]

*Jury Instructions on Prior Violent Felonies*

Ivy next argues that the trial court erred in instructing the jury that he had prior convictions for felonies whose statutory elements involved violence to a person.  He asserts that the trial court violated the Sixth and Fourteenth Amendments to the United States Constitution by making factual findings about the prior felony convictions for the purpose of imposing the death sentence.  Ivy cites

_____

[5] Although later in this opinion we conclude that two of the five prior convictions were not admissible, this conclusion does not alter our holding that the remaining evidence before the jury was sufficient to establish the aggravating circumstance.

[6] We agree with the Court of Criminal Appeals' observation that the (i)(6) aggravating circumstance is analogous to the "forfeiture by wrongdoing" hearsay exception in Rule 804(b)(6) of the Tennessee of Evidence.  As discussed earlier in this opinion, however, we disagree with the Court of Criminal Appeals' implied holding that Rule 804(b)(6) requires that a formal charge or accusation was pending or requires a finding as to a defendant's *sole* motivation.

Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), in which the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the proscribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," and Ring v. Arizona, 536 U.S. 584, 609 (2002), in which the United States Supreme Court held that aggravating factors in a death penalty case must be found by a jury beyond a reasonable doubt because they are "'the functional equivalent of an element of a greater offense.'" (quoting Apprendi, 530 U.S. at 494 n. 19). In reply, the State argues that the trial court followed the correct procedure and that the jury found the aggravating circumstances beyond a reasonable doubt.

We begin our review of this issue by carefully summarizing the key portions of the record. Prior to the penalty phase, the prosecution told the trial court that it intended to establish the "prior violent felony" aggravating circumstance by relying on Ivy's five prior convictions. See Tenn. Code Ann. § 39-13-204(i)(2). The trial court found that the statutory elements of Ivy's prior convictions for second degree murder and especially aggravated robbery plainly involved violence to a person. See Tenn. Code Ann. §§ 39-13-210 and 39-13-403(a). The trial court recognized, however, that Ivy's prior convictions for aggravated assault were more problematic because aggravated assault may be committed with or without actual violence to the person. See Tenn. Code Ann. § 39-13-102(a). As a result, the trial court examined the indictment for aggravated assault in case number 91-02560 and found that the offense had involved violence to the person because Ivy pled guilty to a charge alleging "serious bodily injury." See Tenn. Code Ann. § 39-13-102(a)(1)(B). In addition, although the trial court found that the indictments for aggravated assault in case numbers 90-09886 and 90-09887 did not allege "serious bodily injury,"[7] the trial court also examined the affidavits of complaint:

> [T]he affidavit reads as follows. This is a sworn affidavit of Patsy Pollard on May 11, 1990. 'On May 3rd, 1990, at approximately 5:00 p.m., David Ivy shot into the home of Patsy Pollard at 636 Thomas Number C with a shotgun. No one was injured but Ms. Pollard and several children were in the living room at the time. Davy Ivy also shot through the back door of the home of Sharon Branch at 636 Thomas Number B. Ms. Branch and her two week old baby were in the kitchen at the time. David Ivy had been harassing Ms. Pollard's 16 year old daughter and was still mad at her and apparently thought she was in the house at the time.' *So clearly at least according to this affidavit it involved more than just pointing a gun.*

---

[7] Instead, the indictments alleged that Ivy committed aggravated assault "by use of a deadly weapon [causing] the victim to fear bodily injury." Tenn. Code Ann. § 39-13-102.

After deliberating, the jury found that the aggravating circumstance had been proven beyond a reasonable doubt.

Having summarized the trial court's findings, we now turn to the applicable procedures under our case law. In State v. Sims, 45 S.W.3d 1, 11 (Tenn. 2001), we held that whether the statutory elements of a defendant's prior conviction involved the use of violence to the person is a question of law for the trial court. Moreover, where an offense may be committed either with or without violence to the person, such as aggravated assault, the trial court must conduct a hearing outside the jury's presence and examine the underlying facts of the prior offense. Id. at 12. If the trial court determines that the statutory elements of a prior offense involved the use of violence to the person, the State may introduce evidence of the defendant's conviction for that offense and the jury is instructed that the prior conviction was for an offense involving the use of a violence to the person. Id.

We have upheld the procedures under Sims on several occasions. See State v. Cole, 155 S.W.3d 885, 901-02 (Tenn. 2005); State v. Powers, 101 S.W.3d 383, 400 (Tenn. 2003). In addition, we have rejected the argument that Sims is invalid under Apprendi or Ring because the Sixth Amendment requires facts used to enhance a punishment to be found by a jury beyond a reasonable doubt. As we explained in Cole:

> The (i)(2) aggravating circumstance requires only that the *statutory* elements of the prior felony involve the use of violence to the person. *The Sims procedure authorizes trial judges merely to examine the facts, record, and evidence underlying the prior conviction to ascertain which 'statutory elements' served as the basis of the prior felony conviction. This is a legal determination that neither requires nor allows trial judges to make factual findings as to whether the prior conviction involved violence.*

155 S.W.3d at 904 (emphasis added). In addition, we emphasized that

> [o]nce the trial court determines as a matter of law that the statutory elements of the prior convictions involve the use of violence, the jury must then determine as matters of fact whether the prosecution has proven the (i)(2) aggravating circumstance beyond a reasonable doubt and whether aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. The jury alone must decide these factual questions, and these are the factual questions that determine whether the maximum sentence of death will be imposed.

Id.

The foregoing does not, however, end our analysis. In <u>Shepard v. United States</u>, ___ U.S. ___, 125 S. Ct. 1254 (2005), the U.S. Supreme Court recently clarified the effect of the Sixth and Fourteenth Amendments on a trial court's authority to examine the facts underlying a defendant's prior conviction being used to enhance a sentence. In that case, the district court refused to enhance a defendant's sentence under the Armed Career Criminal Act by relying on police reports offered by the prosecution to show that the prior conviction was for a "violent felony." In upholding the district court's decision, the Court concluded that a trial court may find "the fact of a prior conviction" but is limited to "examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." <u>Id.</u> at 1257. Moreover, the Court emphasized that a trial court may not, under the Sixth and Fourteenth Amendments, make a disputed finding fact that is "too far removed from the conclusive significance of a prior judicial record." <u>Id.</u> at 1262.

In our view, <u>Shepard</u> clarifies but does not invalidate the procedures this Court adopted in <u>Sims</u>. <u>See</u> <u>State v. Rice</u>, ___ S.W.3d ___ (Tenn. 2006). Like <u>Sims</u>, <u>Shepard</u> holds that a trial court may find the "fact" of a prior conviction for enhancing a sentence. Also like <u>Sims</u>, <u>Shepard</u> holds that a trial court may make findings with regard to the nature of a prior conviction. Unlike <u>Sims</u>, however, <u>Shepard</u> clarifies that the Sixth and Fourteenth Amendments allow the trial court to consider only "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." <u>Shepard</u>, 125 S. Ct. at 1257. Thus, we conclude that the trial court's determinations under the procedure in <u>Sims</u> must likewise follow these limitations. <u>See</u> <u>Rice</u>, ___ S.W.3d at ___.

Applying these principles to this case demonstrates that the trial court properly instructed the jury that three of Ivy's five prior convictions were felonies involving the use of violence to the person. As the trial court noted, the statutory elements of second degree murder and especially aggravated robbery plainly involved violence to the person. In addition, the trial court properly examined the indictment in determining that Ivy's prior aggravated assault conviction in case number 91-02560 involved violence to the person; indeed Ivy pleaded guilty to aggravated assault committed by causing "serious bodily injury" to the victim.

The trial court erred, however, in instructing the jury that Ivy's two prior convictions for aggravated assault in case number 90-09886 and case number 90-09887 involved violence to the person. The prosecution conceded that the indictments in these cases alleged only that Ivy had used a deadly weapon and had caused the victims to fear "bodily injury." The trial court, however, examined the detailed allegations of fact contained in the affidavit of complaint. An affidavit of complaint "is a written statement alleging that a person has committed an offense and alleging the essential facts constituting the offense." Tenn. R. Crim. P. 3(a). Although "made upon oath before

-17-

a magistrate or a neutral and detached court clerk who is capable of [a] probable cause determination," id., an affidavit of complaint, like a police report, is not a judicial record of the kind approved in Shepard. Moreover, even though Ivy pled guilty to the two offenses, there is no plea transcript or other evidence indicating that he assented to the facts alleged in the affidavit of complaint. As a result, the trial court should not have considered the affidavit of complaint under Shepard. In addition, even if Ivy had assented to the facts in the affidavit of complaint, a factual question would have arisen as to whether there had been violence or an attempt to commit violence.

As we conclude that the trial court erred, a recent Sixth Circuit case is instructive. In United States v. Kappell, 418 F.3d 550 (6th Cir. 2005), the court held that Shepard did not preclude the district court from considering a criminal complaint in finding that a defendant's prior conviction under a state statute would also have been an offense under federal statute. The court emphasized, however, that the district court "had before it the state criminal complaint, a transcript of the state plea proceedings, *and [the defendant's] acceptance in those proceedings of the factual statements in the complaint.*" Id. at 560 (emphasis added). In contrast, the trial court in the present case considered only the affidavit of complaint without the defendant's assent or agreement as required under Shepard.

Addressing the effect of the trial court's erroneous instructions as to the two prior convictions used by the prosecution in support of the (i)(2) aggravating circumstance, we believe that the appropriate analysis is analogous to that in cases where an aggravating circumstance has been held invalid but other valid aggravating circumstances remain. State v. Howell, 868 S.W.2d 238, 262 (Tenn. 1993).[8] In such cases, the invalid aggravating circumstance is harmless if a reviewing court concludes "beyond a reasonable doubt that the sentence would have been the same had the jury given no weight to the invalid felony murder aggravating factor." Id. We cautioned, however, that:

> In order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

---

[8] Moreover, the Court had concluded prior to Howell that the introduction of an invalid prior conviction to support the (i)(2) aggravating circumstance was subject to harmless error analysis. See State v. Campbell, 664 S.W.2d 281, 283 (Tenn. 1984); State v. Harries, 657 S.W.2d 414, 421 (Tenn. 1983).

Id. at 260-61.

Here, the record shows that the trial court's error was harmless beyond a reasonable doubt. The jury was properly instructed that Ivy had been convicted of second degree murder, especially aggravated robbery, and aggravated assault. These prior convictions, particularly second degree murder and especially aggravated robbery, were objectively reliable and qualitatively persuasive. See id. at 262 (noting that prior convictions under (i)(2) are often more objectively reliable and persuasive than other evidence). The jury was also properly instructed on the (i)(6) aggravating circumstance, i.e., the killing was committed to avoid lawful arrest or prosecution. Moreover, although the prosecutor's closing argument contained a few brief references to Ivy's "five" prior felony convictions in support of the (i)(2) aggravating circumstance, the transcript demonstrates that the prosecutor's arguments would have been no less effective with references to only "three" prior convictions. In addition, the transcript shows that the prosecution placed equal if not more emphasis on the evidence in support of the (i)(6) aggravating circumstance:

> This defendant took a gun, hid out in the bushes where she was staying and waited for her to come out. Why? Because she had come to the law. She had come to 201 Poplar and sworn out a warrant for his arrest on the morning when he beat her over and over and over again with a gun.
>
> * * *
>
> We don't need David Ivy playing God. We don't need David Ivy deciding who gets to go to the police and when they get to. We don't need David Ivy beating up his girlfriend, leaving her unconscious and then when she does the one thing that we have left in an orderly society to hold onto, filling her body with bullets. That's why I submit the legislators wrote that in the law. And the state . . . has proven to you that that's why [the victim] died.
>
> * * *
>
> Why he killed. To try to break the system again [the victim] was struggling so hard to get to help her. That he murdered her to prevent the system from working. And also all the other times he did it.

In contrast, the record shows that the evidence of mitigating circumstance consisted primarily of witnesses asking the jury to impose a life sentence. Thus, we conclude beyond a reasonable doubt

that the jury's verdict would have been the same even without the trial court's error in instructing the jury as to the two aggravated assault convictions.

*Admission of First Degree Murder Indictment*

Ivy argues that the prosecution improperly introduced his prior indictment for first degree murder when establishing his prior conviction for second degree murder as an aggravating circumstance during the sentencing proceeding. Ivy argues that the indictment for first degree murder was irrelevant and unfairly prejudicial because the jury may have believed he pleaded guilty to second degree murder to avoid being convicted of the greater offense. The State argues that the introduction of the indictment was not erroneous.

The admission of evidence in the sentencing phase is governed by Tennessee Code Annotated section 39-13-204(c), which provides in part:

> In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction. *Such evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of such evidence is outweighed by prejudice to either party.* Such evidence shall be used by the jury in determining the weight to be accorded the aggravating factor.

(Emphasis added).

In our view, the trial court erred in allowing the prosecution to introduce Ivy's prior indictment for first degree murder when Ivy's prior conviction was for second degree murder. First, there is no authority allowing an offense charged in a prior indictment to be considered as an aggravating circumstance. Indeed, our prior case law has long established that the prosecution may not rely on prior accusations, arrests, or indictments. See State v. Buck, 670 S.W.2d 600, 606 (Tenn. 1984). Second, there is no authority allowing admission of a defendant's prior indictment simply because the prosecution is relying on a prior conviction stemming from that indictment to establish the "prior violent felony" aggravating circumstance under Tennessee Code Annotated section 39-13-204(i)(2). As discussed in the preceding issue, the threshold question of whether a prior conviction satisfies the requirements of section 204(i)(2) is a question of law for the trial court and not a question of fact for the jury to decide.

In addition, the prior *indictment* for first degree murder was not "evidence" of the "facts and circumstances" of Ivy's prior *conviction* for second degree murder as required for admission under Tennessee Code Annotated section 39-13-204(c). An indictment is not evidence of an offense but rather a charging instrument that informs the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9; Tenn. Code Ann. § 40-13-202 (an indictment "must state the facts constituting the offense in ordinary and concise language"). The purpose of an indictment is to enable a defendant to know the accusation, to furnish the trial court an adequate basis for entry of a proper judgment, and to protect a defendant from a subsequent prosecution for the same offense. See State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). In sum, because a prior indictment is not evidence of a charged offense, it cannot properly be considered "evidence of the facts and circumstances of [a] prior conviction." See Tenn. Code Ann. § 39-13-204(c).

We further conclude, however, that the error was harmless because it did not affect the outcome. Although Ivy's prior first degree murder indictment was read to the jury and introduced as an exhibit, the evidence clearly established that Ivy's prior conviction was for second degree murder in that case and not for first degree murder. The trial court instructed the jury that the prosecution was relying on Ivy's prior conviction for second degree murder as a felony involving violence to the person as an aggravating circumstance. Moreover, the trial court instructed the jury that the prosecution was relying on Ivy's prior convictions for especially aggravated robbery and aggravated assault as felonies involving violence to a person to support the aggravating circumstance. The jury was not instructed that Ivy's prior indictment for first degree murder could be used as an aggravating circumstance. The transcript also reveals that the prosecution's relatively brief closing arguments contained no reference to Ivy's first degree murder indictment and instead were confined to Ivy's prior convictions. Given these circumstances, and the weight of Ivy's prior violent felony convictions in support of this aggravating circumstance, the introduction into evidence of the first degree murder indictment did not affect the outcome. See State v. Cribbs, 967 S.W.2d 773, 781 (Tenn. 1998) (error in admitting defendant's prior conviction for second degree burglary did not affect the outcome where it was not used as an aggravating circumstance and where the defendant had three convictions that properly established the "prior violent felony" aggravating circumstance).

*Residual Doubt Argument*

Ivy next contends that the trial court erred in refusing to allow defense counsel to argue that any "residual doubt" as to Ivy's guilt could be considered as a mitigating circumstance. The State replies that the trial court did not err.

The record reveals that defense counsel told the jury that "if you have any residual doubt about his guilt for the first phase, you found him guilty beyond a reasonable doubt, but if you had any residual doubt you can use that as well." The trial court, out of the jury's presence, told defense

counsel that the argument as to residual doubt was inappropriate and that residual doubt would not be charged to the jury as a mitigating circumstance. The trial court explained:

> [P]roof regarding residual doubt may be appropriate in instances where the State has concealed exculpatory evidence that the defense somehow finds . . . or the defense on [its] own uncovers. . . . [T]he argument of residual doubt is not intended to allow the defense to argue at sentencing to sort of reargue the case that was presented at the guilt phase to sort of go over all of the . . . inconsistencies that exist in the guilt phase . . . .

The trial court concluded that the defense was precluded from arguing "residual doubt with nothing more specific." On appeal, the Court of Criminal Appeals concluded that the trial court's ruling was erroneous but that the error did not affect the outcome of the proceeding.

We begin our review of this issue by noting that "residual doubt *evidence*" may consist of proof admitted during the sentencing phase that indicates the defendant did not commit the offense, notwithstanding the jury's verdict following the guilt phase. State v. McKinney, 74 S.W.3d 291, 307 (Tenn. 2002) (citing State v. Hartman, 42 S.W.3d 44, 55-56 (Tenn. 2001)). We have held that a defendant is allowed "to present evidence at a re-sentencing hearing to establish residual doubt as a non-statutory mitigating circumstance." Hartman, 42 S.W.3d at 55. This holding was based partly upon statutory provisions:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstance of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated . . .; and any evidence tending to establish or rebut any mitigating factors.

Tenn. Code Ann. § 39-13-204(c).

Our holding was not limited to a defendant's introduction of residual doubt *evidence* during the sentencing or re-sentencing phase of a capital trial. McKinney, 74 S.W.3d at 307. Instead, we clarified that a defendant may also rely upon residual doubt *argument* based on evidence that was heard by the jury in the guilt phase of the trial. Id. As we explained in McKinney:

> An argument during sentencing that refers to evidence from the guilt phase is not improper simply because it has the effect of alluding to

-22-

> residual doubt. As we have long held, the manner and conduct of closing argument by the parties is left to the discretion of the trial court. Accordingly, where a defendant seeks to argue residual doubt based on the evidence introduced or in response to an argument made by the prosecution, the trial court should exercise its discretion by resolving any doubt in favor of the defendant's argument.

Id. at 308 (citations omitted).

In this case, the trial court erred in refusing to allow defense counsel to argue that the jury could consider residual doubt based on the evidence presented during the guilt/innocence phase of the trial. Contrary to the trial court's reasoning, there is no requirement that residual doubt *argument* be based on new residual doubt *evidence.* Id.

The trial court's error, however, does not require a new sentencing proceeding for several reasons. First, since this was not a re-sentencing hearing, the sentencing jury had already heard the evidence presented in the guilt phase and had reconciled any conflicts against Ivy's theory of innocence. Indeed, given that the evidence of Ivy's guilt was overwhelming, any argument as to residual doubt would have been of dubious value in mitigation. Second, although the trial court refused to instruct the jury on residual doubt, the instructions to the jury as a whole informed the jury that it could "consider any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing, or both," and that it could consider "any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence." Finally, the two aggravating circumstances found by the jury beyond a reasonable doubt were strongly supported by the evidence. In sum, the defendant has not shown that the error affected the jury's verdict to his prejudice, and therefore the trial court's error was harmless. See id.

*Proportionality*

Whenever a death sentence has been imposed, we must apply a comparative proportionality analysis. See Tenn. Code Ann. § 39-13-206(c)(1)(D). The analysis identifies aberrant, arbitrary, or capricious sentencing by determining whether a death sentence is "'disproportionate to the punishment imposed on others convicted of the same crime.'" State v. Bland, 958 S.W.2d 651, 662 (Tenn. 1997) (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984)).

In using a precedent-seeking method of comparative proportionality review, we compare a case with other cases involving similar defendants and similar crimes. See Bland, 958 S.W.2d at 665-67. While no defendants or crimes are alike, a death sentence is disproportionate if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668.

The pool of cases considered by this Court in its comparative proportionality review includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. See, e.g., State v. Godsey, 60 S.W.3d 759, 783 (Tenn. 2001). The pool does not include first degree murder cases in which a plea bargain is reached with respect to the punishment or in which the State does not seek the death penalty. Id. at 784.

Our comparative proportionality review of the applicable cases considers the factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims. Bland, 958 S.W.2d at 667. We also consider factors about the defendant: (1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Id.; see also Reid, 164 S.W.3d at 316.

In this case, we begin by reviewing the nature of the offense. Ivy had a history of physically abusing the victim, LaKisha Thomas. On June 6, 2001, Ivy attacked Thomas and struck her in the head with a pistol. Ivy followed Thomas as she drove to and from the Criminal Justice Center, and he threatened to kill her if "she put the police in his business." Two days later, Ivy approached Thomas as she sat helpless and unarmed in her car, and he shot her five times at close range. Ivy's actions were intentional and premeditated. He acted without provocation or justification.

We next consider the evidence regarding the defendant and his background. The defendant had prior convictions for second degree murder, especially aggravated robbery, and three aggravated assaults. He had been released on parole for only one year when he shot Thomas to death. There was no evidence that Ivy suffered from any mental, emotional, or physical impairments that mitigated the offense. Likewise, there was no evidence that Ivy cooperated with the authorities; instead, he escaped from the Shelby County Jail in May of 2002 and was arrested two months later in San Diego, California. There was no evidence that Ivy was remorseful for killing Thomas or for committing prior acts of violence against her. In sum, there was no proof that Ivy is amenable to rehabilitation.

In our view, the death sentence imposed in this case was not excessive or disproportionate when compared to defendants in other cases. Tenn. Code Ann. § 39-13-206(c)(1)(A), (C), (D) (2003).

First, this Court has upheld death sentences in numerous similar cases where the defendant shot a victim one or more times. State v. Leach, 148 S.W.3d 42, 60 (Tenn. 2004); State v. Bush, 942 S.W.2d 489, 507 (Tenn. 1997); State v. Hines, 919 S.W.2d 573, 584 (Tenn. 1995); State v. West, 767 S.W.2d 387, 397 (Tenn. 1989).

Second, this Court has upheld numerous death sentences in cases involving a defendant with prior convictions for felonies whose statutory elements involved the use of violence to the person, i.e., one of the aggravating circumstances applied by the jury in this case. See Reid, 164 S.W.3d at 315; Leach, 148 S.W.3d at 60. As this Court has said, this aggravating circumstance is "more qualitatively persuasive and objectively reliable than other[]" aggravating circumstances. Howell, 868 S.W.2d at 261.

Likewise, we have upheld the death penalty in similar cases involving the other aggravating circumstances applied by the jury, i.e., the murder was committed to avoid or prevent the defendant's arrest or prosecution. See Reid, 164 S.W.3d at 315; Davis, 141 S.W.3d at 620; Bush, 942 S.W.2d at 504-05; State v. Thompson, 768 S.W.2d 239, 252 (1989).

Third, numerous death penalty cases have involved a domestic relationship marked by the defendant's abusive conduct against the victim. See State v. Keough, 18 S.W.3d 175 (Tenn. 2000); State v. Hall, 8 S.W.3d 593 (Tenn. 1999); State v. Smith, 868 S.W.2d 561 (Tenn. 1993); State v. Johnson, 743 S.W.2d 154 (Tenn. 1987); State v. Cooper, 718 S.W.2d 256 (Tenn. 1986).

Finally, we have upheld sentences in numerous cases involving defendants who presented similar evidence of mitigating circumstances. For example, several cases have involved defendants who presented evidence of their family backgrounds or childhood environments. See Davis, 141 S.W.3d at 621; Hines, 919 S.W.2d at 573. Moreover, we have upheld the death penalty in numerous cases where the mitigating evidence was much stronger than that in this case. Reid, 164 S.W.3d at 318 (mental illness); Hines, 919 S.W.2d at 573 (defendant with paranoid personality disorder, dysthymia, and chronic depression); Smith, 868 S.W.2d at 561 (defendant with chronic depression, paranoid personality disorder, chronic depressive neurosis, and paranoid delusional disorder); Howell, 868 S.W.2d at 262 (defendant with brain damage).

We need not find that this case is exactly like a prior case in every respect, nor must we determine that this case is "more or less" like other death penalty cases. Instead, we must identify aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. Accordingly, the defendant's arguments are without merit.

*Weighing of Aggravating and Mitigating Circumstances*

As explained above, the evidence supported two aggravating circumstances applied by the jury: that the defendant had previous convictions for felonies whose elements involved violence to the person and that the murders were committed by the defendant to avoid arrest or prosecution. The mitigating circumstances included testimony about the defendant's family background.

After reviewing the record and considering the evidence discussed above with regard to proportionality, we conclude that the evidence supported the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(C).

**CONCLUSION**

Having reviewed the record and applicable authority, we now hold that: 1) the evidence was sufficient to support the first degree murder conviction; 2) the trial court did not err in impaneling an anonymous jury; 3) the trial court properly ruled that the victim's statements were admissible under the "forfeiture by wrongdoing" hearsay exception; 4) the evidence supported the jury's findings that the two aggravating circumstances were proven beyond a reasonable doubt; 5) the trial court erred in instructing the jury that two of the five prior felony convictions relied on by the prosecution involved violence to a person during the sentencing phase but the error was harmless beyond a reasonable doubt; 6) the trial court erred in allowing the prosecution to introduce the defendant's prior indictment for first degree murder in the sentencing phase of the trial where the defendant had been convicted of second degree murder, but the error did not affect the outcome; 7) the trial court erred in ruling that defense counsel could not argue residual doubt as a mitigating circumstance during the sentencing phase, but the error did not affect the outcome; and 8) the evidence of aggravating circumstances outweighed the evidence of mitigating circumstances beyond a reasonable doubt, and the death sentence was not arbitrary or disproportionate. We also agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix. Thus, the Court of Criminal Appeals' judgment is affirmed. The defendant's sentence of death is affirmed and shall be carried out on the 28th day of June, 2006, unless otherwise ordered by this Court or other proper authority. It appearing that Ivy is indigent, the costs of the appeal are taxed to the State of Tennessee.

_____<br>
E. RILEY ANDERSON, JUSTICE