# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 4, 2008 Session

## STATE OF TENNESSEE v. FREDRICK MILAN

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 03-02389, 04-01712     Carolyn Wade Blackett, Judge**

---

**No. W2006-02606-CCA-MR3-CD  - Filed September 26, 2008**

---

A Shelby County Criminal Court jury convicted the appellant, Fredrick Milan, of first degree premeditated murder and aggravated assault, and the trial court sentenced him to consecutive sentences of life and five years, respectively.  On appeal, the appellant contends that (1) the trial court erred by consolidating the offenses; (2) the trial court improperly admitted the victim's prior statement into evidence under the hearsay rule's forfeiture by wrongdoing exception, Tennessee Rule of Evidence 804(b)(6); (3) the trial court erred by admitting into evidence the 9-1-1 tape of an eyewitness to the victim's murder; (4) the trial court erred by admitting an autopsy photograph into evidence; (5) the evidence is insufficient to support the appellant's murder conviction; and (6) the trial court erred by ordering consecutive sentencing and by assessing a five-hundred-dollar fine for the aggravated assault conviction.  The State contends that the evidence is sufficient to support the murder conviction and that the trial court properly ordering consecutive sentencing.  However, the State acknowledges that the trial court improperly fined the appellant.  Regarding the appellant's remaining issues, the State contends that the appellant waived them because he failed to include them in his motion for new trial and that he is not entitled to plain error relief.  We conclude that the evidence is sufficient to support the murder conviction and that consecutive sentencing is proper in this case.  Nevertheless, we also conclude that the trial court committed plain error as to the aggravated assault conviction by consolidating the appellant's indictments for trial and that the trial court erred by imposing the appellant's fine.  Therefore, the appellant's murder conviction is affirmed but his aggravated assault conviction and resulting fine are reversed.  The case is remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in
Part and Reversed in Part, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Robert Brooks (on appeal) and Samuel Perkins (at trial), Memphis, Tennessee, for the appellant,

Fredrick Milan.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and Charles Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I.  Factual Background

A Shelby County grand jury indicted the appellant for committing aggravated assault against the victim, Pamela Stafford, on September 26, 2002, and for committing first degree premeditated murder against her on November 6, 2002.  At trial, Wendy Tolbert testified that she worked with the victim and knew her about six years.  The appellant was the victim's boyfriend, and the victim referred to him as "Daddy."  The appellant lived with the victim, and the victim confided in Tolbert about problems she was having with him.  On the night of September 26, 2002, Tolbert telephoned the victim, but the victim said in a whispered voice that she could not talk to Tolbert and that the appellant was hitting her.  Tolbert could hear "thud noises" and the appellant arguing in the background, and then the phone "went dead."  Sometime later, the victim telephoned Tolbert from the Citgo gas station on Houston Levy Road, and Tolbert drove to the station to pick up the victim.  The victim was holding a kitchen towel over a cut on her arm.  Tolbert said the cut was "pretty deep," was bleeding "pretty good," and needed stitches.  The victim told Tolbert she had telephoned the police and wanted to return to the apartment she shared with the appellant.

Tolbert testified that she drove the victim to the apartment and that the police were there.  The appellant's white Cadillac Escalade was gone, and Tolbert and the victim went inside the apartment to speak with the police.  The officers found the knife that the appellant had used to cut the victim, and the appellant returned to the apartment.  He told Tolbert that "this was all [Tolbert's] fault."  Tolbert said the victim left the apartment and did not return until November 5, 2002.  She was killed the next day, November 6.  The victim was supposed to marry Christopher Higgs on November 7, 2002, "or that weekend."

On cross-examination, Tolbert testified that the victim was afraid of the appellant and wanted to leave him but that he told the victim he would kill her mother, father, and brothers if she left.  The victim was not having a relationship with another man while she was dating the appellant.  On the night the appellant cut the victim's arm, Tolbert called the victim on the victim's cellular telephone between 9:00 and 10:00 p.m.  The police arrested the appellant that night for cutting the victim.  The defense asked Tolbert if the victim told her that the victim paid the appellant's bond, and Tolbert said no.

On redirect examination, Tolbert testified that the victim paid all of the couple's bills, including the rent and the notes on the victim's car and the appellant's Escalade.  The appellant was abusive, and the victim told Tolbert about other instances of abuse he had committed during the

-2-

years she had dated him.

Officer Thomas Manns of the Memphis Police Department testified that on the night of September 26, 2002, he and his partner responded to a domestic violence call at 9935 Barge Drive, apartment number 101, which was near the intersection of Highway 64 and Houston Levy Road. The victim met the officers at the door and told them she had gotten into an altercation with her boyfriend. The victim showed them a two- to three-inch-long wound on her left forearm and said he had cut her. Officer Manns located the weapon, a kitchen steak knife. The victim gave the officers a written statement. According to the statement, the appellant came to the apartment with his parents. He approached the victim, who was sitting on the bed, and said, "[B]itch, I ought to kill you. You should have picked me up from work." The victim told the appellant, "[Y]ou told me not to come, and hung the phone up in my face." The appellant then said, "[B]itch, fuck you" and hit the victim on the left side of her head. The victim pled with the appellant not to hit her anymore. The victim secretly telephoned 9-1-1 on her home telephone because the appellant had broken her cellular telephone. The victim also telephoned Wendy Tolbert. While she was talking with Tolbert, the appellant came into the bedroom and yelled at her to stop using the phone. The victim hung up, and the appellant told her, "[Y]ou make me sick. I'm going to beat your ass." He left the bedroom, returned with a knife, and said, "[B]itch, I'll kill you." He cut the victim on her left arm, and she ran out the front door and to the gas station. Officer Manns testified that while he was finishing his report, the appellant returned to the apartment. The appellant told the officer that he and the victim had gotten into an argument, and Officer Manns arrested him.

On cross-examination, Officer Manns testified that he arrived at the apartment at 9:18 p.m. and that another woman was there with the victim. He offered to take the victim to a safe location, but she declined. The appellant did not give Officer Manns any trouble.

Carla Payne, a deputy clerk for the criminal court clerk's office, testified that the appellant was charged with aggravated assault as a result of his actions on September 26, 2002. General Sessions Court Clerk John Ryan testified that a preliminary hearing for the aggravated assault case was scheduled for November 8, 2002. The appellant's bond was set at fifteen thousand dollars, and he was not to contact or harass the victim as a condition of his bond.

Christopher Higgs testified that in September 2002, he and the victim became engaged. They were planning to get married on November 9, 2002. Higgs did not know the appellant, and the victim did not talk about him. However, the victim told Higgs she had been in an abusive relationship and was no longer living in her apartment. The victim stayed with her mother, brother, and Higgs. Higgs said that he had two cellular telephones, a personal phone and a work phone, and that he told the victim to call him on his work phone if she was ever in trouble. About 9:40 a.m. on November 6, 2002, the victim called Higgs on his work phone, and Higgs knew immediately that the victim was in trouble. The victim told Higgs that she "needed me to come help put his clothes in the truck." She also told Higgs that the appellant had been there but was gone. Higgs told the victim he could not leave work. Sometime later, Higgs telephoned the victim's brother and told him that the victim was not answering her telephone, which was unusual. Subsequently, the victim's

brother contacted Higgs and told him that the victim had been shot. Higgs went to the hospital and later learned that the victim had died.

Victor Stafford, the victim's brother, testified that on the morning of November 6, he received a telephone call from Christopher Higgs, the victim's fiancé. As a result of the call, Victor Stafford went to check on the victim. He saw police cars at the intersection of Highway 64 and Houston Levy Road but drove to his sister's apartment. On the door, he found "a letter for some type of court date that she [was] supposed to have been going to with the defendant." The victim was not home, so Victor Stafford drove back to the intersection and asked the police what was going on. They told him to go to The Med. When he arrived at the hospital, he learned the victim was in surgery. She died later that day.

Lisa Turner testified that about 9:30 a.m. on November 6, 2002, she was stopped at the intersection of Highway 64 and Houston Levy Road. She heard a gunshot and called 9-1-1. While she was on the telephone, Turner saw the victim get out of a white Escalade. Turner thought the victim had been shot inside the truck because the victim was holding a pillow to herself like she was trying to stop bleeding. The appellant, who had been driving the Escalade, got out and was "walking around pretty rapidly with a gun." The victim walked in front of Turner's car, and the appellant came up from behind and shot the victim again from a few feet away. Turner said that the victim had her back to the appellant when he shot her and that the victim had been trying to get away from him. The victim fell onto her back and tried to get up. The appellant walked around, waved the gun, stood over the victim, and shot her in the chest. Turner said that the appellant did not have an expression on his face and that he looked "like he had a job to do and he did it." The appellant walked to the nearby Citgo gas station and talked to a man. Then he got back into the Escalade and turned onto Highway 64.

On cross-examination, Turner testified that she did not see any blood on the victim and was not positive that the victim had been shot in the Escalade. After the victim got out of the Escalade, the appellant shot her in the back or shoulder area. The victim fell down and was lying on her back. The appellant then shot her in the chest. Turner acknowledged that the appellant put the gun to his head before he started waving it around.

Tania Smith testified that on the morning of November 6, 2002, she was driving east on Highway 64. She approached Houston Levy Road and saw the victim lying on the side of the road. Smith pulled over and went to help the victim. The victim was moaning and bleeding, and Smith kneeled down and wiped the victim's contact lenses out of her eyes. The victim was trying to get up, but Smith told her to be still. The appellant was holding a gun and approached Smith. Smith asked him if the victim was okay, and the appellant said, "I hope she's dead." Smith said she was not afraid of the appellant because he was not agitated and seemed "indifferent." The appellant got back into the Escalade, and Smith heard the tires squeal. Smith asked the victim who had done this, and the victim said either "my ex-boyfriend Fredrick" or "my boyfriend Fredrick."

Sherry Trippett testified that on the morning of November 6, she and her mother-in-law were

-4-

stopped at the corner of Highway 64 and Houston Levy. Trippett saw the victim run across traffic and noticed she was holding a pillow to her side. The victim was wearing "slipper socks" but no shoes and looked like she needed help. The appellant got out of an Escalade and had a gun in his hand. He aimed it at the victim and shot her. The victim fell, got up, and tried to get away. The appellant walked toward the victim, stood over her, and shot her again. Trippett saw the appellant talking to two people. He got into the Escalade and drove away. Trippett said that she never took her eyes off him and that he "looked like he had no emotion, that he was just taking care of business."

On cross-examination, Trippett testified that she did not see or hear the appellant say anything to anyone and that he fired the gun three or four times. Trippett assumed the appellant also shot the victim inside the truck because the victim was running away from him and was holding the pillow. However, Trippett did not see any blood. When the appellant shot the victim in the back, the gunshot "flung" the victim's body and she fell forward. The victim stood up, and Trippett's view was blocked briefly by another vehicle. Trippett then saw the appellant standing over the victim, who was lying on her back, and heard a gunshot.

Raynelle Baltz testified that on the morning of November 6, she was driving a FedEx delivery truck and was traveling north on Houston Levy Road. She saw the appellant and the victim standing on the road. At first, she thought the appellant was beating the victim. The victim was holding a pillow to her stomach, and Baltz started to call 9-1-1. The appellant was waving a gun "to make sure that everybody knew not to mess with [him]." Baltz told the 9-1-1 operator that the appellant had a gun. The appellant motioned for the victim to get back into the Escalade, but the victim kept walking in circles. The victim laid down in front of Baltz's truck, and the appellant looked at Baltz and turned around. He was facing away from the victim and looked like he was agonizing over something. Then he turned around "and just went boom. Executed her. Fired in her torso just like that." Baltz pulled into the Citgo parking lot, and the appellant walked into the lot and talked with some people. Someone asked Baltz what was going on, and she told the person what she had seen. When she looked up, the appellant and the Escalade were gone.

Robert Mosley, Jr., testified that on the morning of November 6, he was stopped at the intersection of Highway 64 and Houston Levy Road. He saw something moving on the road, and a woman ran over to the object. She pointed to a white Escalade and said, "[H]e did it. He did it." Mosley realized that the object on the road was a woman. The Escalade "took off," and Mosley followed it on Highway 64. The Escalade turned onto Interstate 40 west, and Mosley followed it for another two or three miles. He said he had to drive one hundred ten miles per hour to keep up with the Escalade. A minivan pulled in front of Mosley, and he had to stop following the Cadillac.

Officer David Ayers of the Memphis Police Department testified that he was dispatched to the intersection of Highway 64 and Houston Levy on November 6. A large crowd was present, and the victim was lying on the street. Officer Ayers asked the victim who had shot her, and the victim said, "Fred."

Donna Buckner testified that she dated the victim's brother, Bernard Stafford, and knew the victim about seven years. She knew the appellant through the victim and had known him about two and one-half years. Sometime in September 2002, the appellant came to Buckner's workplace and talked with her about reconciling with the victim. On November 6, 2002, the appellant telephoned Buckner and told her he had "killed the bitch" and had left her on the side of the road for dead. He told Buckner he shot the victim three times. Buckner heard a woman in the background say, "[W]ho are you talking to, Fredrick, who are you talking to?" The appellant said, "I'm talking to her sister-in-law" and hung up.

Dr. Teresa Campbell testified that in 2002, she was an assistant medical examiner for Shelby County and performed the victim's autopsy on November 7. The victim received three or four gunshot wounds. One bullet entered the middle of the victim's back to the left of her spine. It hit a piece of the spine, entered the right chest cavity, perforated the right lung, and exited near the victim's right armpit. The victim also had a deep grazing wound to her buttocks. Another bullet caused a wound to the side of the victim's left leg and to her upper thigh. Dr. Campbell could not tell which wound was the entrance wound and which was the exit wound. The victim tested negative for alcohol and drugs, and she died of multiple gunshot wounds. Dr. Campbell classified her death as a homicide. On cross-examination, Dr. Campbell testified that there were no entrance wounds to the front of the victim that could have been caused while the victim was lying flat on her back with the appellant standing over her. However, the victim could have been lying on her side.

Ray Davis, the appellant's father, testified for the appellant that sometime in 2002, he was in Memphis and was visiting from Texas. The appellant telephoned and asked Davis to pick him up from work and take him home. Davis picked up the appellant and then picked up Davis' wife, who was not the appellant's mother. Davis and his wife drove the appellant to the appellant's apartment on Highway 64. When they arrived, Davis and his wife sat in the living room, and the victim said something to the appellant. The appellant and the victim were in a back bedroom, and the appellant came into the living room. The victim went into the kitchen and returned to the bedroom. The appellant and Davis left the apartment, and the appellant got into his Escalade while Davis and his wife got into Davis' car. The appellant led Davis and his wife back to the expressway, and the appellant told Davis he was going to his sister's house. Davis stated that he did not see any cuts or bruises on the victim and that he did not hear the appellant fight with her.

On cross-examination, Davis testified that when he, his wife, and the appellant arrived at the apartment, the appellant and the victim were "saying something back and forth to each other" and the victim was talking in a loud voice. Davis decided he and his wife should leave, and he asked the appellant to lead them back to the expressway. Davis never went to the back bedroom of the apartment.

Cosandra Milan, the appellant's sister, testified that on the night of September 26, 2002, she returned home to find the appellant sitting on her porch. He was crying and said he had gotten into

an argument with the victim. He told Cosandra[1] that he "tore [the victim's] cell phone up," and he asked Cosandra to drive him back to the apartment so he could apologize to the victim. The appellant told Cosandra he had done nothing but break the victim's telephone. Cosandra drove the appellant back to the apartment, and they went inside. The police were there and immediately arrested the appellant for assaulting the victim. Cosandra telephoned her mother, and her mother told her to telephone Cosanrda's sister, who worked for a bonding company, to arrange for the appellant's bond. The appellant got out of jail the next day. Cosandra said she did not post his bond.

Cosandra testified that the appellant and the victim continued to see each other after the alleged assault. On November 6, 2002, the victim telephoned Cosandra and asked her to bring the appellant to the victim's apartment so the victim and the appellant could take the Escalade and have ownership transferred to the appellant. Cosandra drove the appellant to the apartment and dropped him off. Later that morning, she returned to her home and saw SWAT cars there. The police asked her if she had seen the appellant, and she told them she had not seen him since that morning. Later, the appellant telephoned Cosandra and told her his location. Cosandra, her mother, Lieutenant Ronnie Thompson, and a detective went to Rally's restaurant on Hickory Hill Road. The appellant did not know Cosandra was going to bring the police. Cosandra and the police pulled into the parking lot, and the appellant walked into the lot. He saw the police and approached Cosandra. He was crying and asked her if the victim was okay. He said he "didn't mean to do it," and Cosandra told him the victim was in critical condition. The police got the appellant something to drink and arrested him.

On cross-examination, Cossandra testified that on September 26, the appellant was living part-time at Cosandra's sister's house and part-time at her mother's house. She stated that the appellant had a white Escalade but that the victim had the truck on the night of September 26. Cosandra did not know how the appellant got to her home. She stated that she did not know anything about the conditions of the appellant's bond for the aggravated assault and that she did not know anything about the shooting on November 6.

Tracy Pittman, the Director of Risk Management for Memphis Bonding Company, testified that he kept records for the company. According to the appellant's bail bond for the aggravated assault charge, the victim and Cosandra Milan signed the bond agreement on September 27, 2002. On cross-examination, Pittman testified that Quenita Milan, the appellant's sister, wrote the bond. He said the victim had posted bonds for the appellant previously. Pittman had proof of the victim's identification for the prior bonds, but he did not have proof of her identification for the September 27 bond.

Mary Jefferson testified that she knew the appellant as "Fat" and the victim as "Pam." On the morning of November 6, she was on Highway 64 and approached Houston Levy Road. She saw

---

[1]Because the witness and the appellant have the same surname, we have chosen to utilize her first name for clarity. We mean no disrespect to this individual.

a truck "weaving and bobbing, stopping, and weaving and bobbing." She recognized the truck and saw the appellant and the victim inside. She said they were "ducking and pointing . . . like fussing and arguing at each other or something." Jefferson later learned the police had arrested the appellant. She acknowledged that the Escalade had tinted windows and said she could not remember if the windows were rolled down when she saw the appellant and the victim.

The appellant testified that he met the victim in 1999. He was married at the time and had two children. However, his wife learned about his affair with the victim and kicked him out of their home. The appellant and the victim rented an apartment, and the lease was in the victim's name. The couple also bought two Cadillac Escalades and a Lexus. Although the appellant owned his own trucking company and made between two hundred fifty thousand and three hundred thousand dollars per year, he had all of the vehicles put in the victim's name so his wife could not claim them.

The appellant testified that on September 26, 2002, he had been driving a truck all week and had been away from home. He telephoned the victim and told her to pick him up at the truck yard. The victim said she was not coming, and he asked her how he was going to get home. She told him, [W]ell, I don't know. Call somebody." The appellant telephoned his father, and his father picked him up. When the appellant, his father, and his father's wife got to the apartment, the appellant checked his mail and went into the bedroom where the victim was talking on her cellular telephone. He asked her why she would not pick him up, and they "had some words back and forth for a minute." The appellant snatched the victim's cellular telephone and "stomped it." He left the bedroom and exchanged dirty clothes in his travel bag for clean clothes. Then he went to the bedroom door and asked the victim if she was going to speak to the appellant's father. The victim said she would be there in a minute. The victim walked to the door of the living room and spoke with the appellant's family. The appellant and the victim argued again, and the appellant's father told him, "I think it's time for you to come on and show me the highway." The appellant led his father and his father's wife to the highway and then drove to Cosandra Milan's house.

The appellant testified that he parked down the street from Cosandra's house and drank beer with some of his brothers. Then he walked to Cosandra's house and sat on her porch. He was crying and thinking about what had happened with the victim. When Cosandra got home, the appellant asked her to take him back to the apartment. As they approached the apartment, they saw police cars. They continued on to the apartment because the appellant had not done anything but break the victim's cellular telephone. Cosandra and the appellant went inside, and the police arrested the appellant for assaulting the victim. Later, the appellant telephoned the victim from jail and asked her why she had him arrested. The victim told him that he had broken her telephone and that she was mad. The next day, the victim paid the appellant's bond. After the alleged assault, the victim continued to live in the apartment, but the appellant moved out. He lived with his sister and spent some nights with his ex-wife. He stated that he did not know how the victim got cut on September 26.

The appellant testified that after the September 26 incident, he and the victim continued to see each other. He said that if the victim had a restraining order against him, he did not know about

it. He and the victim were planning to get married on November 17, and he had bought her two or three diamond rings already. On November 6, they were going to have ownership of the Escalade transferred into the appellant's name and were going to buy the victim another engagement ring. Cosandra drove the appellant to the victim's apartment, and the victim asked the appellant if he had checked with a lawyer about getting a divorce from his wife. Then the appellant and the victim left in the white Escalade. The appellant was driving, and the victim accused him of having sex with someone else. They started arguing, and the victim hit the appellant in his eye. The appellant told the victim he was going to "beat [her] ass," and the victim put a gun to his head and said she was going to shoot him. They struggled over the gun, and the appellant took it from her. When they got to the intersection of Highway 64 and Houston Levy Road, the appellant stopped the truck and the victim turned to get out. The appellant reached for her, and the gun "went off." The appellant and the victim got out of the truck. At first, the appellant testified that he told the victim, "Bring your ass back here. You shot." However, he then testified that he did not know the victim had been shot and asked her, "Is you shot?" The victim fell down on one knee and rolled over. She let go of the pillow she had been carrying, and the appellant saw blood near her shoulder.

The appellant testified that "everything just went blank" and that he looked around but could not think. He denied standing over the victim and shooting her. He said that he did not remember shooting her again but that he must have done so. The appellant said that he put the gun to his head and that he did not know why he did not pull the trigger. He ran to the gas station, saw a man he knew, and told the man about shooting the victim. He asked the man what to do, and the man said, "Go. Leave. Run." The appellant went back to the Escalade and drove away. He stated that he called a police officer he knew, Lieutenant Berryhill. He acknowledged driving one hundred ten miles per hour, but said he did so on Highway 64, not the interstate. He saw a truck chasing him, parked his Escalade at an empty house, jumped out of the Escalade, and ran. The appellant used his cellular telephone to call Lieutenant Berryhill again. The officer was unavailable, and the appellant left his phone number so the officer could call him. The appellant then called his youngest sister, and she picked him up and drove him to Hickory Hill Road. The appellant talked with Lieutenant Berryhill over the phone, and they agreed to meet at the Rally's restaurant on Hickory Hill. The appellant walked to the Rally's parking lot and saw Cosandra's and Lieutenant Berryhill's trucks pull into the lot. Officer Ronnie Thompson was with Lieutenant Berryhill. The appellant approached Lieutenant Berryhill's truck and got inside. He was crying, and the officers told him the victim was going to be okay. The officers took him to the police station, and the appellant gave a statement. He acknowledged that he shot the victim but denied doing so with intent or premeditation. He also acknowledged that he could have shot the victim in the head if he had wanted to kill her. The appellant said he had a prior felony conviction for a drug offense and a prior felony conviction for writing a bad check.

On cross-examination, the appellant acknowledged that he passed the worthless check while he was earning a lot of money. He also acknowledged that it was possible the victim cut herself on September 26, 2002, in order to set him up. He stated that he did not know anything about the conditions of his bond for the aggravated assault charge. Between September 26 and November 6, 2002, the victim continued to live in the apartment but sometimes spent the night at her mother's

house. The appellant acknowledged that even though he and the victim were going to be married on November 17, the victim wanted to transfer ownership of the Escalade to him. He also acknowledged that in his statement to police after the shooting, he did not mention that the victim hit him in the Escalade, pointed the gun at him, or threatened to kill him. The appellant said that after the victim hit him and pointed the gun at him, he was mad. He took the gun from her and reached over. The gun fired, and the victim got out of the truck. The appellant told her to come back, and the victim started to walk back to the truck but fell. The appellant stated that he did not remember the victim getting up and that her shoes were in the truck. He said he never told Tania Smith he hoped the victim was dead, and he denied telephoning Donna Buckner after the shooting. The jury convicted the appellant of first degree premeditated murder and aggravated assault.

## II. Analysis

The appellant argues that (1) the trial court erred by consolidating the indictments for trial; (2) the trial court improperly admitted the victim's prior statement about the September 26, 2002 assault into evidence under the hearsay rule's forfeiture by wrongdoing exception, Tennessee Rule of Evidence 804(b)(6); (3) the trial court erred by admitting Lisa Turner's 9-1-1 tape into evidence; (4) the trial court erred by admitting an autopsy photograph into evidence; (5) the evidence is insufficient to support his murder conviction; and (6) the trial court erred by ordering consecutive sentencing and by assessing a five-hundred-dollar fine for the aggravated assault conviction. The State contends that the evidence is sufficient to support the murder conviction and that the trial court properly ordered consecutive sentencing but acknowledges that the trial court improperly fined the appellant. Regarding the appellant's remaining issues, the State contends that the appellant waived them because he failed to include them in his motion for new trial and that he is not entitled to plain error relief. We conclude that the evidence is sufficient to support the convictions and that consecutive sentencing is proper in this case. However, we also conclude that the trial court committed plain error as to the aggravated assault conviction by consolidating the appellant's indictments for trial and that the trial court erred by imposing the appellant's fine. Therefore, the appellant's murder conviction is affirmed but his aggravated assault conviction and resulting fine are reversed.

First, we must address the State's claim regarding the appellant's having waived most of his issues by failing to include them in his motion for new trial. Failure to raise an issue of error, other than sufficiency of the evidence or sentencing, in a motion for a new trial waives that issue for purposes of appellate review. See Tenn. R. App. P. 3(e). The appellant filed a motion for new trial and an amended motion for new trial. Our review of the motions confirms that the appellant failed to allege any errors regarding the consolidation of the offenses, the victim's hearsay statement, Lisa Turner's 9-1-1 tape, or the autopsy photograph. However, this court may analyze any error under the plain error doctrine.

Tennessee Rule of Criminal Procedure 52(b) provides that this court may address "[a]n error which has affected the substantial rights of an accused . . . at any time, even though not raised in the motion for a new trial . . . where necessary to do substantial justice." See also Tenn. R. Evid. 103(d).

We may only consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)). We will consider whether any of the waived issues warrants plain error relief.

## A. Consolidation of the Offenses

The State filed a pretrial motion to consolidate the separate indictments for trial, and a hearing was held on the motion. At the hearing, the State informed the trial court that as a condition of the appellant's bond for his aggravated assault charge, the appellant was prohibited from harassing, telephoning, or communicating with the victim. Nevertheless, on November 6, 2002, he went to the victim's apartment and shot her at the Highway 64/Houston Levy Road intersection. The State argued that the indictments should be consolidated because failure to do so "would create a chronological void in the presentation of the case and that void would likely result in significant jury confusion." The State also argued that evidence of each of the crimes would be admissible to prove motive, identity, and intent. The defense argued that the indictments should not be consolidated because the crimes were not part of a common scheme or plan. In a written order, the trial court granted the State's motion, stating that "the offenses tend to show a common scheme or plan to cause serious bodily harm or death to the victim." The first requirement for plain error, that the record must clearly establish what occurred in the trial court, has been satisfied.

Next, we must determine whether an unequivocal rule of law has been breached. Tennessee Rule of Criminal Procedure 8(b) states that two or more offenses may be joined in the same indictment if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character. See Tenn. R. Crim. P. 8(b)(1), (2). Tennessee Rule of Criminal Procedure 13(b) provides that the trial court may order severance of offenses prior to trial if such severance could be obtained on motion of a defendant or the State pursuant to Rule 14. See Tenn. R. Crim. P. 13(b). Rule 14(b)(1) provides that "[i]f two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Essentially, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000) (quoting State v. Moore, 6 S.W.3d 235, 239 (Tenn. 1999)). As such, the trial court must

determine from the evidence presented that:

> (1) the multiple offenses constitute parts of a common scheme or plan, (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

Spicer, 12 S.W.3d at 445 (citations omitted).

Typically, common scheme or plan evidence tends to fall into one of three categories:

> (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction.

Moore, 6 S.W.3d at 240. The appellant's offenses were not "signature" crimes. Moreover, they were not part of the same criminal transaction. Neil P. Cohen et al., Tennessee Law of Evidence, § 4.04[13] (5th ed. 2005) (stating that "crimes admitted as part of the 'same transaction' should be limited to those so inextricably connected in time, place, or manner that the jury would be unable to comprehend the essential nature of the charged crime without hearing the evidence of the 'other' crime" (citing Claiborne v. State, 555 S.W.2d 414 (Tenn. Crim. App. 1977)). Therefore, consolidation was proper only if the offenses were part of a larger, continuing plan or conspiracy.

"The larger, continuing plan category encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." State v. Hallock, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). It requires proof of "a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial." State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), overruled on other grounds by Spicer v. State, 12 S.W.3d 438 (Tenn. 2000). Previously, this court has stated that "the larger, continuing plan category has typically been restricted to cases involving crime sprees, where the defendant commits several crimes quite closely in time to one another." State v. Allen Prentice Blye, No. E2001-01375-CCA-R3-CD, 2002 WL 31487524, at *6 (Tenn. Crim. App. Nov. 1, 2002).

Initially, we note that no evidence was presented to the trial court at the motion hearing and that the trial court based its ruling only on counsel's arguments. Thus, the State presented no proof at the consolidation hearing that the offenses were part of a common scheme or plan. Furthermore, even taking into consideration the evidence presented at trial, we cannot conclude that the offenses were part of a larger continuing plan or conspiracy. The proof established that on September 26, 2002, the appellant and the victim got into an argument at their apartment and that the appellant cut the victim's arm. On November 6, 2002, the appellant and the victim were traveling in the Escalade when they got into an argument and the appellant shot the victim. After the victim got out of the

truck, the appellant repeatedly shot her. As noted in the appellant's brief, the only similarity between the crimes is that they involve the same perpetrator and victim. Thus, the trial court should not have granted the State's motion to consolidate, and a clear and unequivocal rule of law was breached.

The appellant adamantly objected to the State's motion. Therefore, he did not waive the issue for tactical reasons. Finally, with regard to the aggravated assault conviction, we conclude that a substantial right of the appellant was adversely affected and that consideration of the error is necessary to do substantial justice because the facts detailing the appellant's brutal killing of the victim were highly prejudicial. However, consideration of the error is not necessary to do substantial justice as to the murder conviction because the evidence against the appellant is so compelling that the trial court's error probably did not change the outcome of the trial for that conviction. Therefore, the appellant is entitled to plain error relief and reversal of his aggravated assault conviction but not the murder conviction.

## B. Forfeiture by Wrongdoing

Next, the appellant contends that the trial court erred by admitting the victim's statement about the September 26, 2002 assault into evidence. Before Officer Manns testified for the State, a jury-out hearing was held regarding the statement the victim made to him on September 26. Officer Manns testified that the victim gave a written statement in which she described the appellant's assault. He then read the statement aloud. The State requested to mark the statement as an exhibit, and the defense objected, arguing that the statement was hearsay and irrelevant. The State contended that the statement was admissible under Tennessee Rule of Evidence 804(b)(6), the forfeiture by wrongdoing exception to the hearsay rule. The State explained to the trial court that "if a person is responsible for the inability of a person to be present to testify, that they, in essence, give up their right to confrontation." The trial court agreed with the State, concluding that "the defendant cannot profit from the fact that she's unavailable." During his testimony, Officer Manns read the statement for the jury in which the victim described how the appellant cut her arm on the night of September 26. On appeal, the appellant contends that the forfeiture by wrongdoing exception does not apply in this case because the trial court failed to make the required finding that the appellant killed the victim in order to procure her unavailability as a witness.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802. The "forfeiture by wrongdoing" exception allows the admission of a hearsay statement "against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness." Tenn. R. Evid. 804(b)(6). "Even intentional misconduct, such as killing a witness, does not qualify unless done for the purpose of procuring the witness's unavailability." Neil P. Cohen et al., Tennessee Law of Evidence § 8.39[2][c] (5th ed. 2005). In determining whether hearsay is admissible under the rule, the trial court must conduct a jury-out hearing and "find that a preponderance of the evidence establishes 1) that the defendant was involved in or responsible for procuring the unavailability of

-13-

the declarant; and 2) that a defendant's actions were intended, at least in part, to procure the absence of the declarant." State v. Ivy, 188 S.W.3d 132, 147 (Tenn. 2006).

In Ivy, the defendant, David Ivy, was frequently violent toward his girlfriend, LaKisha Thomas. In May 2001, Thomas called the police to her apartment and told the responding officer that Ivy had threatened to kill her because she wanted to end their relationship. Id. at 139. On June 6, 2001, another officer responded to a call and found the victim with a cut on her head, bruises on her chest, and a black eye. Id. Thomas told the officer that Ivy had attacked her and had threatened to kill her. Id. After the second incident, Thomas' cousins drove her to the police department, where she swore out a warrant against Ivy for assault. Id. En route to and from the criminal justice center, Thomas and her cousins saw Ivy following them. Id. at 140. After swearing out the warrant and leaving the justice center, Thomas and her cousins stopped at a liquor store, where Ivy approached Thomas and threatened to kill her if she "'put the police in his business.'" Id. Two days later, Ivy shot Thomas to death. Id. At trial, both of the officers who had responded to Thomas' calls testified that Thomas told them Ivy had threatened to kill her, and one of the officers testified about Thomas' physical injuries. Id. at 139. Thomas' relatives also testified that they saw Ivy pull Thomas' hair, that Thomas told them Ivy had kicked in her door and had broken her furniture, and that Thomas told them Ivy would allow her to leave her apartment for only one hour each day. Id. The trial court allowed the hearsay testimony under Rule 804(b)(6). Id. at 146. The jury convicted Ivy of first degree premeditated murder and sentenced him to death.

On appeal, this court held that the proof did not establish by a preponderance of the evidence that Ivy acted with the intent to procure Thomas' unavailability as a witness. See State v. David Ivy, No. W2003-00786-CCA-R3-DD, 2004 Tenn. Crim. App. LEXIS 1154, at *40 (Jackson, Dec. 30, 2004). In reaching this conclusion, our court noted that the warrant for Ivy's arrest was not executed until after Thomas' death and that there was no evidence Ivy was even aware that a warrant had been issued. Id. Our supreme court, however, agreed with the trial court, stating,

> The preponderance of the evidence supported the trial court's finding that Ivy killed Thomas to prevent her from contacting police about his aggravated assault on June 6, 2001. Ivy followed Thomas as she drove to and from the Criminal Justice Center in Memphis, Tennessee, to swear out a warrant against him that was never served. He killed her only two days later. Given these facts, we disagree with the Court of Criminals Appeals' view that Rule 804(b)(6) required that Ivy had to know about the issuance of an arrest warrant for the aggravated assault; moreover, there was no requirement that Ivy's sole intention had to be preventing Thomas from testifying against him in a proceeding based on the aggravated assault.

Ivy, 188 S.W.3d at 147; see also State v. Brooks, 249 S.W.3d 323, 328-29 (Tenn. 2008).

In the recently-decided case of Giles v. California, ___ U.S. ___, 128 S. Ct 2678 (2008), the

-14-

United States Supreme Court explained factors a state court can consider when determining whether a defendant killed a victim with the intent to procure the victim's unavailability as a witness. Although Giles analyzed forfeiture by wrongdoing in terms of its application to the Confrontation Clause rather than the rule against hearsay, the Court's explanation is still helpful in our analysis. As the Supreme Court stated,

> Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution--rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

___ U.S. at ___; 128 S. Ct. at 2693.

Turning to the instant case, the evidence established that on the night of the assault, the appellant cut the victim. Later, the appellant returned to the apartment to find the victim and Wendy Tolbert there with the police. The appellant told Tolbert that "this was all [Tolbert's] fault," demonstrating that he was upset the victim had contacted Tolbert for help. The evidence also established that after the assault, the appellant and the victim stopped living together. The appellant's preliminary hearing was scheduled to take place on November 8, 2002, just two days after he killed the victim. On the day of the victim's death, her brother found a letter on her apartment door, apparently to remind her that she was to appear in court for the hearing. In light of this evidence, we find that the appellant killed the victim, at least in part, with the intent to procure her from testifying against him at the preliminary hearing and that the victim's statement was admissible under the forfeiture by wrongdoing exception to the hearsay rule. Therefore, reading the statement for the jury also did not violate the appellant's right to confrontation. See Giles, ___ U.S. at ___, 128 S. Ct. at 2688; Crawford v. Washington, 541 U.S. 36, 54, 124 S. Ct. 1354, 1366 (2004). An unequivocal rule of law was not breached, and this issue does not warrant plain error relief.

### C. 9-1-1 Tape

The appellant contends that the trial court erred by allowing a 9-1-1 audiotape to be admitted into evidence. The record clearly establishes what occurred in the trial court: After Christopher Higgs testified, the State informed the trial court that it would be calling Lisa Turner to testify and that it wanted to play the audiotape of Turner's 9-1-1 call for the jury. The defense objected, arguing that the tape was redundant because Turner was going to testify about what she witnessed on November 6. The defense also argued that the tape was highly prejudicial. The State countered that on the tape, Turner described the events as they were happening, giving the jury "a very good time frame of what we're talking about." The trial court listened to the tape, concluded it was not unfairly

-15-

prejudicial, and ruled it was admissible.

On appeal, the appellant contends for the first time that the tape was inadmissible hearsay. We have listened to the audiotape. The tape begins with a 9-1-1 dispatcher answering Lisa Turner's call. Turner immediately states, "There's a man in front of me. He has just shot his wife. She's laying here." Turner begins telling the dispatcher what is happening and says,"I am scared to death. I don't know if I should move or not." The dispatcher transfers her call to the fire department, and Turner tells a second dispatcher, "He's just shot his wife two or three times. She's laying here dying in the road." After the appellant leaves the scene, Turner informs the dispatcher that she is getting out of her car and going to check on the victim. A commotion can be heard in the background, and Turner's voice trembles as she tells the dispatcher, "She's still breathing." Turner's statements were hearsay but were admissible as excited utterances. See Tenn. R. Evid. 803(2). Moreover, we agree with the trial court that the statements were not unfairly prejudicial. Therefore, a clear and unequivocal rule of law was not breached by the trial court, and the record does not support a finding that the admission of the 9-1-1 tape was plain error.

## D. Autopsy Photograph

The appellant contends that the trial court erred by admitting an autopsy photograph into evidence. At the conclusion of Wendy Tolbert's direct testimony, the State requested to show her an autopsy photograph of the victim. The defense objected, stating that "[w]e've already stipulated that the woman was dead" and arguing that the photograph was irrelevant. The State claimed that the photograph was necessary in order for Tolbert "to tie in the identity of who the autopsy was on." The State decided that it would have the photograph marked for identification but that it would be shown to the medical examiner during her testimony and marked as an exhibit at that time. The trial court asked to see the photograph and said, "I would prefer that you do it that way, because I'm having a problem with you [publishing] it to this jury right now." During Dr. Campbell's testimony, the State showed the photograph to her, and she testified that it was a "photograph of the woman identified to me as Pamela Stafford that I took at the autopsy." The State moved the photograph into evidence as an exhibit over the defense's renewed objection.

On appeal, the appellant contends that the photograph was irrelevant because the defense did not question the identity of the body on which Dr. Campbell performed the autopsy. We agree with the appellant that the photograph had little probative value. See State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). However, the photograph is a closeup of the victim's face, shows very little blood, and is not gruesome. Therefore, introducing the photograph into evidence probably did not affect the result of the trial. Consideration of the error is not necessary to do substantial justice, and the appellant is not entitled to plain error relief.

## E. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his first degree murder conviction because the evidence fails to show that he premeditated killing the victim. The State

argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated several circumstances from which a jury may infer premeditation, including, but not limited to, declarations of the intent to kill, evidence of the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id.

Taken in the light most favorable to the State, the evidence shows that the appellant and the victim were traveling in the Escalade on the morning of November 6. They got into an argument, and the appellant stopped the truck at the intersection of Highway 64 and Houston Levy Road. As the victim turned to get out of the passenger side of the truck, the appellant shot her. Bleeding and clutching a pillow to her side, the unarmed victim walked away. The appellant got out of the Escalade and ordered the victim to get back into the truck, but the victim continued to walk away. The appellant aimed at the victim and shot her in the back. The appellant contends that the evidence shows the shooting was "spontaneous." However, Raynelle Baltz testified that just before the appellant shot the victim, he looked like he was agonizing over something, evidence that the appellant exercised reflection and judgment before he shot her. He then walked over to the victim, stood over her, and shot her a third time as she was lying on the ground. Tania Smith ran to the victim's aid, and the appellant calmly walked up to Smith and told her that he hoped the victim was dead. Smith testified that she was not afraid of the appellant because he was not agitated and seemed indifferent. Although there was no evidence that the appellant made declarations to kill the victim before the shooting, he threatened to kill her on September 26. Given the appellant's prior threat to kill the victim, his use of a deadly weapon on the unarmed victim, the particular cruelty of the

-17-

killing, and the appellant's calmness immediately after the killing, we conclude that the evidence is sufficient to support the appellant's first degree premeditated murder conviction.

## F. Sentencing

The appellant contends that the trial court erred by ordering consecutive sentencing because he does not have an extensive criminal history and because the circumstances of the offenses do not justify his classification as a dangerous offender. The appellant also contends that the trial court erred by assessing a five-hundred-dollar fine against him. The State acknowledges that the fine was improper but contends that consecutive sentencing is appropriate in this case. Although we have reversed the appellant's aggravated assault conviction, we will address his sentencing issues to facilitate further appellate review. We agree with the State and conclude that the trial court could not impose a fine in this case but that the trial court properly ordered consecutive sentencing.

Officer Raymond Russell Tilton of the Memphis Police Department testified that while the appellant was being held in jail on the charges in this case, he substantially assisted the police department in a federal investigation of public corruption involving deputy jailers. Officer Tilton said the investigation could not have been successful without the appellant's assistance, and he asked the court to take the appellant's assistance into consideration for sentencing. On cross-examination, Officer Tilton acknowledged that in return for the appellant's help, officers agreed to "let the Judge know about his assistance to help him out in his sentencing if he was found guilty of the charges against him."

The State introduced the appellant's presentence report into evidence. According to the report, the then thirty-seven-year-old appellant had an adult son and two minor children, graduated from high school, and completed truck driving school. In the report, the appellant stated that he suffered from high blood pressure, diabetes, an irregular heartbeat, acid reflux, and depression and was taking various medications for his ailments. He characterized his physical health as fair and his mental health as good and stated that he worked for MLG Trucking for three months in 2002 and owned his own fleet of trucks from 1998 to 2002. The report shows that the appellant has two prior felony convictions for drug offenses and ten prior misdemeanor convictions, including convictions for violating the bad check law, assault, unlawful possession of a weapon, disorderly conduct, and driving without a license.

The trial court sentenced the appellant to five years for the aggravated assault conviction. See Tenn. Code Ann. § 40-35-112(a)(3). As to consecutive sentencing, the trial court stated that the appellant's criminal record was "somewhat" extensive. See Tenn. Code Ann. § 40-35-115(b)(2). Regarding the appellant's being a dangerous offender, the trial court noted that the circumstances surrounding the offenses were aggravated, that confinement for an extended period of time was necessary to protect the public, and that the length of the sentences reasonably related to the offenses. Specifically, the trial court stated as follows:

The Court finds at this time that the sentence for the murder

-18-

one and the aggravated assault will be served consecutive in light of the facts that were produced at the trial, which show that there was no question that this defendant had very little or no regard for human life, as to the fact of how the victim was killed, as to the facts that were testified to during the trial in terms of the aggravated assault and what occurred on that night the [victim] suffered that aggravated assault, the circumstances surrounding this conviction for the murder as well as the aggravated assault, all led and were linked to each other.

The trial court ordered that the appellant serve the sentences consecutively and imposed a five-hundred-dollar fine for the aggravated assault conviction.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

Tennessee Code Annotated section 40-35-115(b)(4) provides for consecutive sentencing if "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." In order to support consecutive sentencing based upon a defendant's being a dangerous offender, a court must find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)). Moreover, trial courts must make specific findings regarding these Wilkerson factors before imposing consecutive sentences. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In this case, the court specifically addressed the Wilkerson factors and stated that the manner in which the victim was assaulted and killed supported those factors. We agree. The appellant inflicted a deep cut on the victim's arm on September 26, and she moved out of their apartment. She had only returned to the apartment one day before she was killed. On November 6, the appellant shot the victim in the Escalade, shot her in the back as she attempted to flee from him, and stood over her as he shot her a third time. Consecutive sentencing is appropriate in this case.

Regarding the appellant's fine, article VI, section 14 of the Tennessee Constitution provides

that no fine more than fifty dollars can be assessed against a defendant "unless it shall be assessed by a jury of his peers, who shall assess the fine at the time they find the fact, if they think the fine should be more than fifty dollars." We have reviewed the jury instructions in this case, and the instructions only asked the jury to determine guilt or innocence. The instructions did mention a fine. Likewise, the jury's verdict only made findings of guilt and did not impose a fine, and nothing in the record indicates the appellant waived his right to have the jury set his fine. Therefore, the trial court was without authority to assess a fine in this case.

### III.  Conclusion

Based upon the record and the parties' briefs we reverse the appellant's aggravated assault conviction and resulting fine and remand the case for retrial. The appellant's conviction for first degree premeditated murder is affirmed.

_____
NORMA McGEE OGLE, JUDGE